JUDGE BRICCETTI

14 CV 5636

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000
Ira S. Dizengoff
Philip C. Dublin
Deborah J. Newman
Brian T. Carney

*Counsel for Apollo Global Management, LLC
and certain of its affiliated funds*



RECEIVED
JUL 23 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

WILMINGTON TRUST, NATIONAL ASSOCIATION,
AS TRUSTEE,

                    Plaintiff,

        -against-

JPMORGAN CHASE BANK, N.A., AS
INTERCREDITOR AGENT UNDER THE
INTERCREDITOR AGREEMENT, WILMINGTON
SAVINGS FUND SOCIETY, FSB, AS SUCCESSOR
SECOND LIEN INDENTURE TRUSTEE, APOLLO
GLOBAL MANAGEMENT L.L.C., EURO VI (BC)
S.À.R.L., WELLPOINT, INC., ONTARIO PUBLIC
SERVICE EMPLOYEES UNION PENSION PLAN
TRUST FUND, ARISTEIA HORIZONS, LP,
WINDERMERE IRELAND FUND PLC, COMPASS
TSMA, LP, COMPASS ESMA, LP, DOUBLE BLACK
DIAMOND OFFSHORE LTD., BLACK DIAMOND
OFFSHORE LTD., GSO AIGUILLE DES GRANDS
MONTETS FUND I LP, GSO AIGUILLE DES GRANDS
MONTETS FUND II LP, GSO AIGUILLE DES GRANDS
MONTETS FUND III LP, GSO CREDIT-A PARTNERS
LP, GSO PALMETTO OPPORTUNISTIC INVESTMENT
PARTNERS LP, FS GLOBAL CREDIT
OPPORTUNITIES FUND, GSO COASTLINE CREDIT
PARTNERS LP, GSO STEAMBOAT CREDIT
OPPORTUNITIES MASTER FUND LP, GSO SPECIAL
SITUATIONS FUND LP, GSO SPECIAL SITUATIONS

Civil Case No.:

OVERSEAS MASTER FUND LTD., OCM OPPS MTIV
HOLDINGS, LLC, LMA SPC FOR AND ON BEHALF
OF THE MAP 98 SEGREGATED PORTFOLIO,
OCEANA MASTER FUND LTD., PENTWATER
CREDIT OPPORTUNITIES MASTER FUND LTD.,
PENTWATER EQUITY OPPORTUNITIES MASTER
FUND LTD., PENTWATER EVENT DRIVEN CAYMAN
FUND LIMITED, PENTWATER EVENT EQUITY
REFLECTION FUND, PENTWATER MERGER
ARBITRAGE MASTER FUND LTD, PWCM MASTER
FUND LTD, THIRD AVENUE FOCUSED CREDIT
FUND, THIRD AVENUE HIGH YIELD CREDIT FUND,
THIRD AVENUE VALUE INCOME FUND, LP, JURA
LIMITED, MANULIFE GLOBAL FOCUSED
BALANCE FUND, ARES MANAGEMENT LLC, ARES
SSF RIOPELLE, L.P., ARES SPECIAL SITUATIONS
FUND III, L.P., TRANSATLANTIC REINSURANCE
COMPANY, RSUI INDEMNITY COMPANY, ASIP
(HOLDCO) IV S.A.R.L., ARES SENIOR LOAN TRUST,
ARES MULTI-STRATEGY CREDIT FUND V (H), L.P.,
PPF NOMINEE 1 B.V., CARLSON CAPITAL, L.P.,
OAKTREE CAPITAL MANAGEMENT, L.P., JOHN
DOES #1-10, FORTRESS CREDIT ADVISORS LLC,
D.E. SHAW GALVANIC PORTFOLIOS, L.L.C. AND
JOHN DOES #11-20,

Defendants.

------------------------------------------------------------------------X

## NOTICE OF REMOVAL

Please take notice, that pursuant to 28 U.S.C. §§ 1334 and 1452 and Rule 9027 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), defendants Apollo Global

Management, LLC and Euro VI (BC) S.a.r.l. (together, the "Apollo Defendants") hereby remove

the matter of *Wilmington Trust, National Association v. JPMorgan Chase Bank, N.A., et al.*,

index number [652181/2014] (the "Intercreditor Action"), which is currently pending in the

Supreme Court of the State of New York for the County of New York (the "State Court"), to the

United States District Court for the Southern District of New York for automatic referral to the

United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") presiding over the chapter 11 cases (the "Chapter 11 Cases") of Momentive Performance Materials, Inc. ("MPM") and certain of its affiliates (collectively, "Debtors").[1]  *See Amended Standing Order of Reference Re: Title 11,* No. 12 Misc. 0032 (S.D.N.Y. Jan. 31, 2012).[2]  In support of removal, the Apollo Defendants respectfully state as follows:

## FACTS WARRANTING REMOVAL

1.     The Debtors are one of the world's largest producers of silicone and silicone derivatives, and are a global leader in the development and manufacture of products derived from quartz and specialty ceramics.  Apollo Global Management, LLC, along with certain of its affiliated funds, (collectively, "Apollo") owns approximately 39% and 33%, respectively, of certain second lien notes (the "Second Lien Notes") and certain subordinated notes (the "Subordinated Notes") issued by MPM.

2.     On April 13, 2014, the Debtors commenced the Chapter 11 Cases.  The Chapter 11 Cases are being jointly administered in the Bankruptcy Court before United States Bankruptcy Judge Robert D. Drain.

3.     Also on April 13, 2014, the Debtors entered into a restructuring support agreement (the "RSA") with Apollo and the members of an ad hoc committee of holders of Second Lien Notes (the "Ad Hoc Committee" and, together with Apollo, the "RSA Parties"). Through the RSA, the RSA Parties agreed to support, and, subject to applicable law, vote in

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Juniper Bond Holdings I LLC (9631), Juniper Bond Holdings II LLC (9692), Juniper Bond Holdings III LLC (9765), Juniper Bond Holdings IV LLC (9836), Momentive Performance Materials China SPV Inc. (8469), Momentive Performance Materials Holdings Inc. (8246), Momentive Performance Materials Inc. (8297), Momentive Performance Materials Quartz, Inc. (9929), Momentive Performance Materials South America Inc. (4895), Momentive Performance Materials USA Inc. (8388), Momentive Performance Materials Worldwide Inc. (8357), and MPM Silicones, LLC (5481).

[2] Pursuant to Rule 9027 of the Federal Rules of Bankruptcy Procedure, the Apollo Defendants are simultaneously filing, and serving on all parties, a copy of this Notice of Removal with the State Court, and all process and pleadings filed with the State Court are attached hereto as **Exhibit A**.

favor of, a chapter 11 plan to be proposed by the Debtors consistent with the terms set forth in a term sheet annexed to the RSA.[3]  On June 23, 2014, the Debtors filed their proposed plan of reorganization (the "Plan") [No. 14-22503, ECF No. 515].

       4.      The lynchpin of the restructuring contemplated by the RSA and the Plan is a $600 million rights offering (the "Rights Offering") that Apollo, the members of the Ad Hoc Committee, and certain other parties (collectively, the "Backstop Parties") have committed to backstop pursuant to and on the terms and conditions set forth in an agreement dated May 9, 2014 (the "Backstop Agreement").[4]

       5.      On May 9, 2014, the Debtors also commenced an adversary proceeding (the "Optional Redemption Litigation") in which they seek a declaration that the holders of certain secured debt issued by MPM (the "1.5 Lien Notes," and the holders of such notes, the "1.5 Lien Noteholders") are not entitled to an optional redemption premium under the indenture governing the 1.5 Lien Notes (the "1.5 Lien Notes Indenture").  On June 25 and June 30, respectively, the Ad Hoc Committee and Apollo were granted permission to intervene in the Optional Redemption Litigation.

       6.      On June 19, 2014 (the "June 19 Hearing"), the Bankruptcy Court heard argument respecting the Debtors' motions for Bankruptcy Court's (i) authorization to assume the RSA, (ii) permission to enter into and perform under the Backstop Agreement, and (iii) authorization to solicit votes respecting the Plan.  Wilmington Trust, National Association, the successor trustee under the 1.5 Lien Notes Indenture, and the plaintiff in this action ("Plaintiff"), opposed each of these motions.

---

[3] The RSA was subsequently amended on April 16, 2014 [No. 14-22503 (RDD), ECF No. 42], April 28, 2014, April 30 2014, May 2, 2014, May 5, 2014, May 6, 2014, May 9, 2014 [No. 14-22503 (RDD), ECF No. 147] and on June 21, 2014 [No. 14-22503 (RDD), ECF No. 504].

[4] The Backstop Agreement was subsequently amended on June 21, 2014 [No. 14-22503 (RDD), ECF No. 505].

7.      All of the motions were approved by the Bankruptcy Court at the June 19 Hearing or by order dated June 23, 2014.  [No. 14-22503, ECF Nos. 507 and 509, respectively].  A hearing on confirmation of the Plan is currently set to commence on August 18, 2014.  The Bankruptcy Court indicated at the June 19 Hearing that the Optional Redemption Litigation would be adjudicated in connection with the hearing on confirmation of the Plan.  *See* Transcript of Hearing Before the Honorable Robert D. Drain on June 19, 2014, at 147:25-148:6 [No. 14-08227, ECF No. 28].

8.      On July 16, 2014, Plaintiff commenced the Intercreditor Action in the State Court. The defendants in the Intercreditor Action (collectively, "Defendants") are the RSA Parties, the successor indenture trustee under the indenture governing the Second Lien Notes (the "Second Lien Trustee"), and the agent under an intercreditor agreement (the "Intercreditor Agreement") between, *inter alia*, the 1.5 Lien Noteholders and the holders of the Second Lien Notes (the "Second Lien Noteholders").

9.      In the Intercreditor Action, Plaintiff seeks a declaration that the RSA Parties have violated the Intercreditor Agreement by, *inter alia*:  (i) agreeing to support a plan of reorganization and related disclosure statement that—according to Plaintiff—pays the Second Lien Notes with collateral securing both the 1.5 Lien Notes and the Second Lien Notes (the "Common Collateral"), or the proceeds thereof, without first paying the 1.5 Lien Noteholders in full in cash; (ii) intervening in the Optional Redemption Litigation; (iii) supporting the Debtors' efforts to enter into new loan agreements with higher payment priority than the 1.5 Lien Noteholders; and (iv) obtaining an agreement to have the Debtors pay their professional fees before the 1.5 Lien Noteholders are paid in full in cash.

10.    The Intercreditor Action makes substantially identical claims for relief against, *inter alia*, the Apollo Defendants to those made in an action filed by the holders of certain first lien secured debt issued by MPM (the "First Lien Notes," and the holders of such notes, the "First Lien Noteholders"). That action (the "First Lien Intercreditor Action") was originally filed in the State Court on June 18, 2014, as *BOKF, N.A. v. JPMorgan Chase Bank, N.A., et al.*, index number [651861/2014]. On July 8, 2014, the Apollo Defendants removed the First Lien Intercreditor Action to this Court as Case No. 14-cv-05086-VB. On July 16, 2014, the First Lien Intercreditor Action was automatically referred to the Bankruptcy Court as Case No. 14-08247.

11.    Pursuant to the Backstop Agreement (and the Bankruptcy Court order approving it), the Debtors have agreed to, and are required to, indemnify Apollo and the other Backstop Parties from and against any and all losses, claims, damages, liabilities, and costs and expenses that such parties may incur in connection with the Intercreditor Action, including defense fees and expenses. *See* Backstop Agreement § 8.1 [No. 14-22503, ECF No. 509 Ex. A].

## JURISDICTION, VENUE, AND THE BASIS FOR REMOVAL

12.    This Court has jurisdiction over the Intercreditor Action under Sections 1452 and 1334 of title 28 of the United States Code. Section 1452 provides that "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334" of title 28 of the United States Code. 28 U.S.C. § 1452(a). Section 1334, in turn, provides in relevant part that the "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [i.e., the Bankruptcy Code], or arising in or related to cases under title 11." 28 U.S.C. § 1334(b) (emphasis added). The Intercreditor Action is both "related to," and "arising in," the Chapter 11 Cases.

13. A civil proceeding is "related to" a bankruptcy case if the resolution of the proceeding could have a "conceivable effect" on the administration of the bankrupt estate. *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992). There can be no dispute that the Intercreditor Action satisfies this standard. The issues that must be adjudicated in the Intercreditor Action overlap with those that will be resolved in connection with the Bankruptcy Court's adjudication of the Plan and the Optional Redemption Litigation, and the resolution of these issues will have a direct impact on distributions to be made to the Debtors' various creditors under the Plan. For example, Plaintiff seeks a declaration in the Intercreditor Action that the Debtors may not discharge the 1.5 Lien Notes without paying the 1.5 Lien Noteholders in full in cash and making an optional redemption payment, that the RSA Parties have violated the Intercreditor Agreement by supporting the Plan that does not provide for such payment, and that any Common Collateral or proceeds thereof distributed to the Second Lien Lenders under the Plan must be turned over to the Plaintiff, or held in trust for Plaintiff's benefit. The Debtors and the RSA Parties, in turn, in supporting confirmation of the Plan and litigating the Optional Redemption Litigation, will be arguing to the Bankruptcy Court that the 1.5 Lien Noteholders are not entitled to the optional redemption payment, that the 1.5 Lien Notes may be discharged without such a payment, and that the Second Lien Noteholders may retain the distributions proposed to be made to them under the Plan. It is thus beyond dispute that the outcome of the Intercreditor Action "could alter the debtor's rights, liabilities, options, or freedom of action" and "impact[] . . . the handling and the administration of the [Debtors'] bankrupt estate." *Certain Underwriters at Lloyds, London v. ABB Lummus Global, Inc.*, 2004 WL 1286806, at *4 (S.D.N.Y. June 10, 2004). As such, the Intercreditor Action should be adjudicated by the court that will be presiding over the confirmation of the Plan and the Optional Redemption Litigation.

14.     Additionally, the Intercreditor Action will have an immediate economic impact on the Debtors' estates, regardless of its outcome.  The Backstop Agreement and related Bankruptcy Court order require the Debtors to indemnify Apollo and the other Backstop Parties for, *inter alia*, any liabilities they incur in connection with the Intercreditor Action, including any defense fees and expenses.  Courts have held that where, as here, a debtor is obligated to indemnify a non-debtor defendant, the case is properly removed because the indemnification obligation will necessarily affect the ultimate administration of the debtor's estate.  *See In re River Ctr. Holdings, LLC*, 288 B.R. 59, 65 (Bankr. S.D.N.Y. 2003) (finding "even if [an asserted indemnification] obligation is not contractual and absolute, 'related to' jurisdiction exists if the disputed or conditional indemnity claim has a 'reasonable legal basis'") (citing *Masterwear Corp. v. Rubin Baum Levin Constant & Friedman* (*In re Masterwear Corp.*), 241 B.R. 511, 515 (Bankr. S.D.N.Y. 1999)); *see also Bond St. Assocs. v. Ames Dep't. Stores, Inc.*, 174 B.R. 28, 33 (S.D.N.Y. 1994) (finding a reasonable basis for "related-to" jurisdiction where there was no indemnification agreement, but the third-party defendant would "normally have a claim" for indemnification against the debtor).

15.     The Intercreditor Action also "arises in" the Chapter 11 Cases.  28 U.S.C. § 1334(b).  In general, a case "aris[es] in" a case under title 11 if, by its very nature, the claim can only be brought in a bankruptcy action, because it has no existence outside of bankruptcy. *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, 2007 WL 4323003, at *3 (S.D.N.Y. Dec. 10, 2007).  While general disputes over the appropriate interpretation of an intercreditor agreement can arise outside of a bankruptcy action, the claims at issue in the Intercreditor Action could not, as they relate to issues—such as the appropriate distributions under a plan of reorganization— that are essential to the Chapter 11 Cases, and can arise only in the context of a bankruptcy case.

## CORE PROCEEDING

16.     This action is a core proceeding under 28 U.S.C. § 157(b)(2).  Pursuant to Local Bankruptcy Rule 9027-1, the Apollo Defendants consent to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## REFERRAL TO BANKRUPTCY COURT

17.     Under this Court's standing administrative order on the referral of matters to bankruptcy judges, this action should be automatically referred automatically to the Bankruptcy Court. *See Amended Standing Order of Reference Re: Title 11,* No. 12 Misc. 0032 (S.D.N.Y. Jan. 31, 2012).

## CONCLUSION

Based upon the foregoing, the Apollo Defendants request that the Intercreditor Action proceed in this Court as a properly removed action, and that the action be referred to the United States Bankruptcy Court for the Southern District of New York.


Dated: New York, New York
       July 23, 2014

                                        AKIN GUMP STRAUSS HAUER & FELD LLP

                                        By:

                                            Ira S. Dizengoff
                                            Philip C. Dublin
                                            Deborah J. Newman
                                            Brian T. Carney
                                            One Bryant Park
                                            New York, NY 10036
                                            (212) 872-1000 (Telephone)

(212) 872-1002 (Facsimile)
idizengoff@akingump.com
pdublin@akingump.com
djnewman@akingump.com
bcarney@akingump.com

*Counsel to Apollo Global Management, LLC and
certain of its affiliated funds*

# Exhibit A

FILED: NEW YORK COUNTY CLERK 07/16/2014
INDEX NO. 652181/2014

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 07/16/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
WILMINGTON TRUST, NATIONAL ASSOCIATION, AS
TRUSTEE,

                                         Plaintiff,

                  -against-

JPMORGAN CHASE BANK, N.A., AS INTERCREDITOR
AGENT UNDER THE INTERCREDITOR AGREEMENT,
WILMINGTON SAVINGS FUND SOCIETY, FSB, AS
SUCCESSOR SECOND LIEN INDENTURE TRUSTEE,
APOLLO GLOBAL MANAGEMENT L.L.C., EURO
VI (BC) S.À.R.L., WELLPOINT, INC., ONTARIO
PUBLIC SERVICE EMPLOYEES UNION PENSION
PLAN TRUST FUND, ARISTEIA HORIZONS, LP,
WINDERMERE IRELAND FUND PLC, COMPASS
TSMA, LP, COMPASS ESMA, LP, DOUBLE BLACK
DIAMOND OFFSHORE LTD., BLACK DIAMOND
OFFSHORE LTD., GSO AIGUILLE DES GRANDS
MONTETS FUND I LP, GSO AIGUILLE DES GRANDS
MONTETS FUND II LP, GSO AIGUILLE DES GRANDS
MONTETS FUND III LP, GSO CREDIT-A PARTNERS
LP, GSO PALMETTO OPPORTUNISTIC INVESTMENT
PARTNERS LP, FS GLOBAL CREDIT OPPORTUNITIES
FUND, GSO COASTLINE CREDIT PARTNERS LP, GSO
STEAMBOAT CREDIT OPPORTUNITIES MASTER
FUND LP, GSO SPECIAL SITUATIONS FUND LP, GSO
SPECIAL SITUATIONS OVERSEAS MASTER FUND
LTD., OCM OPPS MTIV HOLDINGS, LLC, LMA SPC
FOR AND ON BEHALF OF THE MAP 98 SEGREGATED
PORTFOLIO, OCEANA MASTER FUND LTD.,
PENTWATER CREDIT OPPORTUNITIES MASTER
FUND LTD., PENTWATER EQUITY OPPORTUNITIES
MASTER FUND LTD., PENTWATER EVENT DRIVEN
CAYMAN FUND LIMITED, PENTWATER EVENT
EQUITY REFLECTION FUND, PENTWATER MERGER
ARBITRAGE MASTER FUND LTD, PWCM MASTER
FUND LTD, THIRD AVENUE FOCUSED CREDIT
FUND, THIRD AVENUE HIGH YIELD CREDIT FUND,
THIRD AVENUE VALUE INCOME FUND, LP, JURA
LIMITED, MANULIFE GLOBAL FOCUSED BALANCE
FUND, ARES MANAGEMENT LLC, ARES SSF
RIOPELLE, L.P., ARES SPECIAL SITUATIONS FUND
III, L.P., TRANSATLANTIC REINSURANCE

Index No.

_____

**SUMMONS**

Plaintiff designates New York
County as the place of trial
based upon the consent of the
parties hereto.

COMPANY, RSUI INDEMNITY COMPANY, ASIP
(HOLDCO) IV S.À.R.L., ARES SENIOR LOAN TRUST,
ARES MULTI-STRATEGY CREDIT FUND V (H), L.P.,
PPF NOMINEE 1 B.V., CARLSON CAPITAL, L.P.,
OAKTREE CAPITAL MANAGEMENT, L.P., JOHN
DOES #1-10, FORTRESS CREDIT ADVISORS LLC, D.E.
SHAW GALVANIC PORTFOLIOS, L.L.C. AND JOHN
DOES #11-20,

                                             Defendants.

--------------------------------------------------------------------------X

TO THE ABOVE NAMED DEFENDANTS:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and to
serve a copy of your answer, or, if the complaint is not served with this summons, to serve a
notice of appearance, on the Plaintiffs' undersigned attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is complete if
this summons is not personally delivered to you within the State of New York); and in case of
your failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the complaint.

Dated: New York, New York
       July 16, 2014

                                  CURTIS, MALLET-PREVOST,
                                   COLT & MOSLE LLP

                 By:

                                   Steven J. Reisman
                                   Theresa A. Foudy
                                   Gabriel Hertzberg
                                   101 Park Avenue
                                   New York, New York  10178-0061
                                   Tel:  (212) 696-6000
                                   Fax:  (212) 697-1559
                                   Email: sreisman@curtis.com
                                            tfoudy@curtis.com
                                            ghertzberg@curtis.com

                                 *Counsel for Wilmington Trust,*
                                   *National Association, as Trustee*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
WILMINGTON TRUST, NATIONAL ASSOCIATION, AS
TRUSTEE,

                                        Plaintiff,

                 -against-

JPMORGAN CHASE BANK, N.A., AS INTERCREDITOR
AGENT UNDER THE INTERCREDITOR AGREEMENT,
WILMINGTON SAVINGS FUND SOCIETY, FSB, AS
SUCCESSOR SECOND LIEN INDENTURE TRUSTEE,
APOLLO GLOBAL MANAGEMENT L.L.C., EURO
VI (BC) S.À.R.L., WELLPOINT, INC., ONTARIO
PUBLIC SERVICE EMPLOYEES UNION PENSION
PLAN TRUST FUND, ARISTEIA HORIZONS, L.P.,
WINDERMERE IRELAND FUND PLC, COMPASS
TSMA, LP, COMPASS ESMA, LP, DOUBLE BLACK
DIAMOND OFFSHORE LTD., BLACK DIAMOND
OFFSHORE LTD., GSO AIGUILLE DES GRANDS
MONTETS FUND I LP, GSO AIGUILLE DES GRANDS
MONTETS FUND II LP, GSO AIGUILLE DES GRANDS
MONTETS FUND III LP, GSO CREDIT-A PARTNERS
LP, GSO PALMETTO OPPORTUNISTIC INVESTMENT
PARTNERS LP, FS GLOBAL CREDIT OPPORTUNITIES
FUND, GSO COASTLINE CREDIT PARTNERS LP, GSO
STEAMBOAT CREDIT OPPORTUNITIES MASTER
FUND LP, GSO SPECIAL SITUATIONS FUND LP, GSO
SPECIAL SITUATIONS OVERSEAS MASTER FUND
LTD., OCM OPPS MTIV HOLDINGS, LLC, LMA SPC
FOR AND ON BEHALF OF THE MAP 98 SEGREGATED
PORTFOLIO, OCEANA MASTER FUND LTD.,
PENTWATER CREDIT OPPORTUNITIES MASTER
FUND LTD., PENTWATER EQUITY OPPORTUNITIES
MASTER FUND LTD., PENTWATER EVENT DRIVEN
CAYMAN FUND LIMITED, PENTWATER EVENT
EQUITY REFLECTION FUND, PENTWATER MERGER
ARBITRAGE MASTER FUND LTD, PWCM MASTER
FUND LTD, THIRD AVENUE FOCUSED CREDIT
FUND, THIRD AVENUE HIGH YIELD CREDIT FUND,
THIRD AVENUE VALUE INCOME FUND, LP, JURA
LIMITED, MANULIFE GLOBAL FOCUSED BALANCE
FUND, ARES MANAGEMENT LLC, ARES SSF
RIOPELLE, L.P., ARES SPECIAL SITUATIONS FUND
III, L.P., TRANSATLANTIC REINSURANCE

Index No.

_____

**COMPLAINT**

COMPANY, RSUI INDEMNITY COMPANY, ASIP
(HOLDCO) IV S.À.R.L., ARES SENIOR LOAN TRUST,
ARES MULTI-STRATEGY CREDIT FUND V (H), L.P.,
PPF NOMINEE 1 B.V., CARLSON CAPITAL, L.P.,
OAKTREE CAPITAL MANAGEMENT, L.P., JOHN
DOES #1-10, FORTRESS CREDIT ADVISORS LLC, D.E.
SHAW GALVANIC PORTFOLIOS, L.L.C. AND JOHN
DOES #11-20,

                                              Defendants.
-------------------------------------------------------------------------X

       Plaintiff Wilmington Trust, National Association ("Wilmington" or "Plaintiff"),

solely as Trustee under the 1.5 Lien Notes Indenture (defined below), alleges on information and

belief the following against Defendants (1) JPMorgan Chase Bank, N.A. ("JPMCB" or the

"Intercreditor Agent"), as intercreditor agent under the Intercreditor Agreement dated as of

November 16, 2012 (the "Intercreditor Agreement"); (2) Wilmington Savings Fund Society,

FSB, in its capacity as successor trustee ("WSFS" or the "Second-Priority Agent") under the

Indenture dated as of November 5, 2010 (as amended or modified from time to time, the "Second

Priority Indenture"); (3) Apollo Global Management L.L.C. ("Apollo"), Euro VI (BC) S.À.R.L.,

WellPoint, Inc., Ontario Public Service Employees Union Pension Plan Trust Fund, Aristeia

Horizons, L.P., Windermere Ireland Fund PLC, Compass TSMA, LP, Compass ESMA, LP,

Double Black Diamond Offshore Ltd., Black Diamond Offshore Ltd., GSO Aiguille des Grands

Montets Fund I LP, GSO Aiguille des Grands Montets Fund II LP, GSO Aiguille des Grands

Montets Fund III LP, GSO Credit-A Partners LP, GSO Palmetto Opportunistic Investment

Partners LP, FS Global Credit Opportunities Fund, GSO Coastline Credit Partners LP, GSO

Steamboat Credit Opportunities Master Fund LP, GSO Special Situations Fund LP, GSO Special

Situations Overseas Master Fund Ltd., OCM OPPS MTIV Holdings, LLC, LMA SPC for and on

behalf of the MAP 98 Segregated Portfolio, Oceana Master Fund Ltd., Pentwater Credit

Opportunities Master Fund Ltd., Pentwater Equity Opportunities Master Fund Ltd., Pentwater

Event Driven Cayman Fund Limited, Pentwater Event Equity Reflection Fund, Pentwater

Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., Third Avenue Focused Credit

Fund, Third Avenue High Yield Credit Fund, Third Avenue Value Income Fund, LP, Jura

Limited, Manulife Global Focused Balance Fund, Ares Management LLC, Ares SSF Riopelle,

L.P., Ares Special Situations Fund III, L.P., Transatlantic Reinsurance Company, RSUI

Indemnity Company, ASIP (Holdco) IV S.À.R.L., Ares Senior Loan Trust, Ares Multi-Strategy

Credit Fund V (H), L.P., PPF Nominee 1 B.V., Carlson Capital, L.P., Oaktree Capital

Management, L.P., and John Does #1-10 (who, because they are parties to the Restructuring

Support Agreement described below, are defined as the "RSA Parties"); and (4) Fortress Credit

Advisors LLC, D.E. Shaw Galvanic Portfolios, L.L.C., and John Does #11-20 (the "Non-RSA

Parties") (collectively, the "Defendants").

## PRELIMINARY STATEMENT

1.       This is an action for breach of contract and declaratory judgment.  The

contract at issue is the Intercreditor Agreement among various lenders to a non-party borrower,

Momentive Performance Materials Inc., and certain of its affiliates (collectively, "MPM").

2.       The Intercreditor Agreement was executed on November 16, 2012.  Prior

to that date, MPM borrowed money on a secured basis from two categories of lenders:  senior

lenders and junior lenders.  This action is commenced by a group of senior lenders against a

group of junior lenders.

3.       The junior lenders ("Second-Priority Secured Parties") extended credit to

MPM through a bond offering.  The Second-Priority Secured Parties include both the RSA

Parties and the Non-RSA Parties.  Defendant WSFS is the substitute trustee for this junior

indenture and is the agent for the Second-Priority Secured Parties.

4.     The senior lenders ("Senior Lenders") extended money through a cash flow lending facility[1] and in connection with two separate bond offerings: the First Lien Notes Indenture[2] and the 1.5 Lien Notes Indenture (defined below).  Plaintiff Wilmington is the successor trustee for the 1.5 Lien Notes Indenture (defined below) and is the agent for the lenders thereunder (the "1.5 Lien Lenders").

5.     The Second-Priority Secured Parties and the Senior Lenders, including the 1.5 Lien Lenders, have liens on certain collateral of MPM (the "Common Collateral") and the proceeds of the Common Collateral.  The liens of the Senior Lenders have priority over the liens of the Second-Priority Secured Parties.

6.     In connection with MPM's borrowings, the Senior Lenders and Second-Priority Secured Parties, through their agents, among others, entered into the Intercreditor Agreement.

7.     The Intercreditor Agreement establishes the relationship of the Senior Lenders collectively, on one hand, and Second-Priority Secured Parties, on the other, to each other and to the borrower, MPM, so that, if MPM defaulted on its obligations or there appeared to be a risk of non-payment, there would be ground rules in place to handle the situation.

8.     Generally speaking, the Intercreditor Agreement also prohibits the Second-Priority Secured Parties or their agent from receiving any Common Collateral or proceeds of Common Collateral before the Senior Lenders have been paid in full in cash, and

---

[1]     The Amended and Restated Credit Agreement dated as of February 10, 2011 among MPM, Momentive Performance Materials Holdings Inc., a Delaware corporation, Momentive Performance Materials USA Inc., Momentive Performance Materials GmbH (f/k/a Blitz 06-103 GmbH), JPMorgan Chase Bank, NA, as administrative agent for the lenders, and J.P. Morgan Securities LLC, Citigroup Global Markets Inc. and Morgan Joseph Triartisan Finance LLC, as joint lead arrangers (the "Credit Agreement").

[2]     That certain Indenture, dated as of October 25, 2012, pursuant to which $1,100,000,000 in aggregate principal amount of 8.875% First Priority Senior Secured Notes due 2020 were issued by Momentive Performance Materials Inc. and guaranteed by the Debtors (as defined herein).

also prohibits the Second-Priority Secured Parties from interfering with the Senior Lenders' efforts to be repaid or to obtain "adequate protection" (as that term is defined in the United States Bankruptcy Code) for their secured claims.

9.      The Intercreditor Agreement also protects the rights of the Second-Priority Secured Parties and their agents by preventing a chaotic asset-grab or confusion as to the various parties' legal rights vis-à-vis each other or their priorities in the event that MPM might not meet its obligations or in the event of a default.

10.     MPM and certain of its subsidiaries (the "Debtors") have filed petitions for bankruptcy, and the RSA Parties have taken numerous steps in violation of their obligations under the Intercreditor Agreement.  For example, the RSA Parties have interfered with the efforts of the 1.5 Lien Lenders to be paid in full in cash, and have agreed to take proceeds of Common Collateral of MPM in the form of new stock, or, alternatively, to take $30 million from the Common Collateral or proceeds thereof prior to the discharge of MPM's obligations to the 1.5 Lien Lenders.  The RSA Parties have also intervened as plaintiffs in a lawsuit commenced by the Debtors seeking to prevent the 1.5 Lien Lenders from collecting certain Obligations (defined below) of the Debtors.  In addition, the RSA Parties have supported the Debtors' efforts to enter into new loan agreements with a higher payment priority than that of the 1.5 Lien Lenders, and have supported approval of a disclosure statement and plan of reorganization that provide for less than full satisfaction of the 1.5 Lien Lenders' claims.  Finally, the RSA Parties have obtained an agreement to have their professional fees paid before payment in full of the 1.5 Lien Lenders. All of these actions violate the Intercreditor Agreement.

11.     Wilmington, as agent for and on behalf of the 1.5 Lien Lenders, brings this action for damages based on the RSA Parties' violation of their contractual obligations under the

Intercreditor Agreement. Wilmington also brings this action for declaratory relief against all the Second-Priority Secured Parties, WSFS, as their agent under the Intercreditor Agreement, and JPMCB, as Intercreditor Agent, to prevent future violations.

## PARTIES

12.     Plaintiff Wilmington became the agent for the 1.5 Lien Lenders under the 1.5 Lien Notes Indenture (defined below), replacing The Bank of New York Mellon Trust Company, N.A., on April 16, 2014. It is a party to the Intercreditor Agreement in that capacity and represents the interests of the 1.5 Lien Lenders. Plaintiff Wilmington is a national bank with its principal place of business located in Delaware. It is authorized to transact business and has transacted business in the State of New York.

13.     Defendant JPMCB is Intercreditor Agent under the Intercreditor Agreement and represents the interests of both the Senior Lenders and the Second-Priority Secured Parties. Upon information and belief, Defendant JPMCB is a national bank with its principal place of business located in Columbus, Ohio that is authorized to transact business and has transacted business in the State of New York.

14.     Defendant WSFS is the substitute agent for the Second-Priority Secured Parties under the Second Priority Indenture and the Intercreditor Agreement. It therefore represents the interests of the Second-Priority Secured Parties. Upon information and belief, Defendant WSFS is a Delaware corporation with a principal place of business located in Wilmington, Delaware.

15.     Upon information and belief, the RSA Parties are as follows:

- Apollo Global Management L.L.C., a limited liability company organized and existing under the laws of the state of Delaware;

- Euro VI (BC) S.À.R.L., a société à responsabilité limitée domiciled in the Grand Duchy of Luxembourg;

- WellPoint, Inc., a corporation organized and existing under the laws of the state of Indiana;

- Ontario Public Service Employees Union Pension Plan Trust Fund, a fund domiciled in Canada;

- Aristeia Horizons, L.P., a limited partnership domiciled in the Cayman Islands;

- Windermere Ireland Fund PLC, a public limited company domiciled in Ireland;

- Compass TSMA LP, a limited partnership domiciled in the Cayman Islands;

- Compass ESMA, LP, a limited partnership domiciled in the Cayman Islands;

- Double Black Diamond Offshore Ltd., a company domiciled in the Cayman Islands;

- Black Diamond Offshore Ltd., a company domiciled in the Cayman Islands;

- GSO Aiguille des Grands Montets Fund I LP, a limited partnership domiciled in Canada;

- GSO Aiguille des Grands Montets Fund II LP, a limited partnership domiciled in Canada;

- GSO Aiguille des Grands Montets Fund III LP, a limited partnership domiciled in Canada;

- GSO Credit-A Partners LP, a limited partnership organized and existing under the laws of the state of Delaware;

- GSO Palmetto Opportunistic Investment Partners LP, a limited partnership organized and existing under the laws of the state of Delaware;

- FS Global Credit Opportunities Fund, a limited partnership organized and existing under the laws of the state of Delaware;

- GSO Coastline Credit Partners LP, a limited partnership organized and existing under the laws of the state of Delaware;

- GSO Steamboat Credit Opportunities Master Fund LP, a limited partnership domiciled in the Cayman Islands;

- GSO Special Situations Fund LP, a limited partnership organized and existing under the laws of the state of Delaware;

- GSO Special Situations Overseas Master Fund Ltd., a company domiciled in the Cayman Islands;

- OCM OPPS MTIV Holdings, LLC, a limited liability company organized and existing under the laws of the state of Delaware;

- LMA SPC for and on behalf of the MAP 98 Segregated Portfolio, a company domiciled in the Cayman Islands;

- Oceana Master Fund Ltd., a company domiciled in the Cayman Islands;

- Pentwater Credit Opportunities Master Fund Ltd., a company domiciled in the Cayman Islands;

- Pentwater Equity Opportunities Master Fund Ltd., a company domiciled in the Cayman Islands;

- Pentwater Event Driven Cayman Fund Limited, a fund domiciled in the Cayman Islands;

- Pentwater Event Equity Reflection Fund, a fund domiciled in Ireland;

- Pentwater Merger Arbitrage Master Fund Ltd., a company domiciled in the Cayman Islands;

- PWCM Master Fund Ltd., a company domiciled in the Cayman Islands;

- Third Avenue Focused Credit Fund, a fund organized and existing under the laws of the state of Delaware;

- Third Avenue High Yield Credit Fund, a fund domiciled in Ireland;

- Third Avenue Value Income Fund, LP, a limited partnership organized and existing under the laws of the state of Delaware;

- Jura Limited, a company domiciled in Ireland;

- Manulife Global Focused Balance Fund, a fund domiciled in Canada;

- Ares Management LLC, a limited liability company organized and existing under the laws of the state of Delaware;

- Ares SSF Riopelle, L.P., a limited partnership organized and existing under the laws of the state of Delaware;

- Ares Special Situations Fund III, L.P., a limited partnership organized and existing under the laws of the state of Delaware;

- Transatlantic Reinsurance Company, a company organized and existing under the laws of the state of New York;

- RSUI Indemnity Company, a company organized and existing under the laws of the state of Georgia;

- ASIP (Holdco) IV S.À.R.L., a société à responsabilité limitée organized and existing under the laws of Luxembourg;

- Ares Senior Loan Trust, a company organized and existing under the laws of the state of Delaware;

- Ares Multi-Strategy Credit Fund V (H), L.P., a company domiciled in the Cayman Islands;

- PPF Nominee 1 B.V., a company domiciled in the Netherlands;

- Carlson Capital, L.P., a limited partnership organized and existing under the laws of the state of Delaware;

- Oaktree Capital Management, L.P., a limited partnership organized and existing under the laws of the state of Delaware; and

- John Does #1-10, unidentified and unknown Second-Priority Secured Parties who signed onto the Restructuring Support Agreement.

16.     Upon information and belief, the Non-RSA Parties are as follows:

- Fortress Credit Advisors LLC, a limited liability company organized and existing under the laws of the state of the state of Delaware;

- D.E. Shaw Galvanic Portfolios, L.L.C., a limited liability company organized and existing under the laws of the state of Delaware; and

- John Does #11-20, unidentified and unknown Second-Priority Secured Parties who have not signed onto the Restructuring Support Agreement.

## JURISDICTION AND VENUE

17.     The Second-Priority Secured Parties have consented to New York jurisdiction and venue in this Court.

18.     The Second-Priority Secured Parties entered into the Intercreditor Agreement through their agent, now WSFS, and the Agreement expressly states that it is binding upon the holders of "Second-Priority Claims" — that is, the Second-Priority Secured Parties. (§ 8.16.)

19.     Section 8.7 of the Intercreditor Agreement provides as follows:

The parties hereto consent to the jurisdiction of any state or federal court located in New York County, New York, and . . . [t]he parties hereto waive any objection to any action instituted hereunder in any such court based on forum non conveniens, and any objection to the venue of any action instituted hereunder in any such court.

20.     Thus, this Court has jurisdiction over this action pursuant to General Obligations Law § 5-1402, because Defendants have agreed to submit to the jurisdiction of the courts of this state.

21.     Venue is proper in this county pursuant to New York CPLR § 501 because Defendants have agreed that venue is appropriate in any court in this state.

## FACTUAL BACKGROUND

### The Indebtedness Giving Rise to the Senior and Second-Priority Claims

22.     MPM and its affiliates manufacture silicone, silicone-based derivatives, quartz, ceramics and other specialty materials for industrial applications. They are the second-largest producers of silicones in the world.

23.     MPM and its affiliate, Momentive Specialty Chemicals Inc., were formed in 2006 by the sale of the General Electric Advanced Materials business to Apollo as part of a $3.8 billion leveraged buyout (the "Apollo LBO").  In connection with Apollo's leveraged acquisition, MPM issued more than $3 billion of debt.  Since then, the company struggled to make payments on its debts.  The company never posted an annual profit following the Apollo LBO.

24.     The Second-Priority Secured Parties are holders of MPM debt pursuant to the Second Priority Indenture.  Pursuant to the Second Priority Indenture, two types of bonds were issued:  (a) the initial $1,160,687,000 in aggregate principal amount of 9.0% Second Priority Lien Notes due 2021; and (b) the initial €150,000,000 in aggregate principal amount of 9.5% Second Priority Springing Lien Notes due 2021 (collectively, the "Second Lien Notes"). These obligations are secured.

25.     The 1.5 Lien Lenders are holders of MPM debt (the "1.5 Lien Notes") pursuant to an Indenture, dated as of May 25, 2012, pursuant to which $250,000,000 in aggregate principal amount of 10% Senior Secured Notes due 2020 were issued by MPM (the "1.5 Lien Notes Indenture," and together with the First Lien Notes Indenture and Second Priority Indenture, the "Indentures").

**The Intercreditor Agreement**

26.     In November 2012, The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon"), then trustee for the 1.5 Lien Lenders, MPM, and JPMCB, among others, entered into the Intercreditor Agreement.  In April 2014, Defendant WSFS was substituted as trustee for the Second-Priority Secured Parties.  Also in April 2014, Plaintiff Wilmington was

substituted as trustee for the 1.5 Lien Lenders.  Wilmington and BNY Mellon are collectively referred to as the "1.5 Lien Trustee."

27.     The purpose of the Intercreditor Agreement is to protect MPM and the holders of its debt, vis-à-vis MPM and each other, in the event that MPM is unable, may be unable, or is unwilling to repay its debts.  The Intercreditor Agreement extends to "all of the assets of [MPM], whether real, personal or mixed, constituting both Senior Lender Collateral and Second-Priority Collateral," which it defines as the "Common Collateral," and to the proceeds of Common Collateral.  (Intercreditor Agreement § 1.1).

28.     The Intercreditor Agreement defines rights to the Common Collateral with respect to two categories of claim-holders:  the "Senior Lender Claims" and the "Second-Priority Secured Parties."  Generally:

a.   The Senior Lender Claims are the claims of the holders of all "First-Lien Indebtedness."  The First-Lien Indebtedness is the indebtedness under the Credit Agreement, the First Lien Notes Indenture, the 1.5 Lien Notes Indenture, and other senior lender documents.  The 1.5 Lien Lenders are the secured lenders under the 1.5 Lien Notes Indenture.

b.   The Second-Priority Secured Parties are all persons holding any secured Second-Priority Claims who are beneficiaries of the Intercreditor Agreement.

29.     The Intercreditor Agreement provides, among other things, that until the Senior Lender Claims are paid all amounts due to them in cash (as defined therein, the

"<u>Discharge of Senior Lender Claims</u>"), WSFS, as agent, and the Second-Priority Secured Parties will not:

a. exercise any remedies with respect to the Common Collateral (§ 3.l(a)(i)(x));

b. interfere with the Senior Lenders' exclusive rights to enforce rights or exercise remedies with respect to the Common Collateral (§ 3.1(a)(ii));

c. take actions adverse to the Senior Lenders' liens on the Common Collateral (§ 3.1(a)(B));

d. take or receive Common Collateral or proceeds of Common Collateral in connection with the exercise of rights in respect of their claims (§ 3.1(b));

e. take any action that would hinder the 1.5 Lien Trustee's or any Senior Lender's exercise of remedies (§ 3.1(c));

f. commence or join any efforts to collect on their interest in the Common Collateral (§ 3.2);

g. object to any request for judicial relief made by the 1.5 Lien Trustee relating to the lawful enforcement of any lien of any Senior Lender (§ 6.1); and

h. not contest or object to:  (i) any request for adequate protection by any Senior Lender, or (ii) the claim for lack of adequate protection by any Senior Lender (§ 6.3).

30.     The Intercreditor Agreement further provides that after an event of default under any "First Lien Indebtedness" (generally, defined as a default to Senior Lenders), and notice thereof, "so long as the Discharge of Senior Lender Claims has not occurred, the Common Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Common Collateral upon the exercise of remedies, shall be applied by the Intercreditor Agent to the Senior Lender Claims . . . ." (§ 4.1).  Section 4.2 provides that if the Second-Priority Agent or a Second-Priority Secured Party receives any Common Collateral or the proceeds thereof, it is to segregate those assets "and [hold] in trust for the benefit of and forthwith paid over to the Intercreditor Agent (and/or its designees) for the benefit of the applicable Senior Lender . . . ."

31.     In addition to having obligations under the Intercreditor Agreement, the Second-Priority Secured Parties also have rights and benefits.  For example, they have the right to prompt delivery of any Common Collateral after the Discharge of Senior Lender Claims has occurred.  (§ 4.1).

32.     WSFS is an agent for the Second-Priority Secured Parties.  Because WSFS is a party to the Intercreditor Agreement in its capacity as the agent for the Second-Priority Secured Parties, Wilmington may enforce the terms of the Intercreditor Agreement directly against the Second-Priority Secured Parties including the RSA Parties.  The Intercreditor Agreement states that it "shall be applicable prior to and after the commencement of any Insolvency or Liquidation," which includes a bankruptcy filing.  (§ 6.5; *see also* § 7.3(d)).

**The Bankruptcy Filing and the Breaches of**
**the Intercreditor Agreement by the RSA Parties**

33.     On April 13, 2014 (the "<u>Petition Date</u>"), the Debtors filed a series of related chapter 11 bankruptcy cases captioned *In re MPM Silicones, LLC, et al.,* Case No. 14-

22503 (RDD) (the "Chapter 11 Cases") which are pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The filings constituted an event of default under the Indentures, and the Second-Priority Secured Parties had notice of the commencement of the Chapter 11 Cases. The Discharge of Senior Lender Claims has not occurred.

34.     Since prior to and following the commencement of the Chapter 11 Cases, the RSA Parties have taken numerous actions in direct violation of the Intercreditor Agreement.

35.     For example, the RSA Parties have intervened in the Debtors' lawsuit to prevent the 1.5 Lien Lenders from collecting the make-whole payment (and the professional fees incurred by the 1.5 Lien Trustee in defending the lawsuit) to which they are entitled under the 1.5 Lien Notes Indenture.

36.     The RSA Parties have supported efforts by the Debtors to enter into new loan agreements that have priority over the existing liens of the 1.5 Lien Lenders.

37.     The RSA Parties supported the Debtors' efforts to obtain approval of a disclosure statement filed by the Debtors which describes a chapter 11 plan (discussed below) that in turn provides for the treatment of the 1.5 Lien Lenders' claims in violation of the Intercreditor Agreement.

38.     The RSA Parties also have breached the Intercreditor Agreement by entering into a restructuring support agreement (the "RSA") with the Debtors. The RSA violates the terms of the Intercreditor Agreement in at least four independent ways.

39.     First, pursuant to the RSA, the RSA Parties are supporting the Debtors' reorganization plan (the "Plan" or "Chapter 11 Plan"). The Plan does not provide for the

-15-

Discharge of Senior Lender Claims[3] (which include the claims of the 1.5 Lien Lenders).  Yet, the

RSA Parties have agreed not only to support this Plan, but also:  (i) not to "change or withdraw .

. . such vote (in support of the Plan); (ii) not object to, or support any other person's efforts to

oppose or object to, confirmation of the Plan, . . . (iii) refrain from taking any action that is

materially inconsistent with, or that would materially delay or impede approval . . . of the

Restructuring or the Plan . . . ; and (iv) not, directly or indirectly, propose, support, solicit,

encourage, initiate or participate in any offer or proposal from, or enter into any agreement with,

any person or entity concerning any actual or proposed Alternative Transaction."[4]  (RSA § 1.1

(b)).

---

[3]       The Intercreditor Agreement states that:

> *"Discharge of Senior Lender Claims"* shall mean, except to the extent
> otherwise provided in Section 5.7, *payment in full in cash* (except for
> contingent indemnities and cost and reimbursement obligations to the extent no
> claim has been made) of (a) all Obligations in respect of all outstanding First-
> Lien Indebtedness and, with respect to letters of credit or letter of credit
> guaranties outstanding thereunder, delivery of cash collateral or backstop
> letters of credit in respect thereof in compliance with the Senior Credit
> Agreements, in each case after or concurrently with the termination of all
> commitments to extend credit thereunder and (b) any other Senior Lender
> Claims that are due and payable or otherwise accrued and owing at or prior
> to the time such principal and interest are paid....
>
> *"Obligations"* shall mean, with respect to any Indebtedness, any and all
> obligations, whether now owing or hereafter arising, with respect to the
> payment of (a) any principal or interest (including interest accrued on or
> accruing after the commencement of any Insolvency or Liquidation
> Proceeding, whether or not a claim for post-filing interest is allowed in such
> proceeding) or premium on any Indebtedness, including any reimbursement
> obligation in respect of any letter of credit or letter of credit guaranty, (b)
> any fees, indemnification obligations, expense reimbursement obligations or
> other liabilities payable under the documentation governing such
> Indebtedness....

(*Id.* § 1.1; emphasis added).

[4]       The RSA defines an Alternative Transaction as essentially any plan other than the Debtors' Plan, or any
series of transactions that accomplish something other than what is intended to be accomplished through the
Debtors' Plan.  (RSA § 1.1(a)(vii)).

40.     Specifically, the Plan provides for two alternative treatments for the 1.5 Lien Lenders' claims, neither of which results in the payment in full in cash of the 1.5 Lien Lenders' claims as required by the Intercreditor Agreement.  Payment of secured claims under a plan of reorganization other than in full and in cash (or otherwise with consent of the secured creditor) is referred to as "cramdown," because the treatment is being forced upon the affected creditors.  Item (ii) below contemplates cramdown in the event that the 1.5 Lien Lenders do not vote to accept cash (in an amount that excludes the make-whole or similar claim) under the Plan, as follows:

> On the Effective Date, or as soon as practicable thereafter, each holder of an Allowed 1.5 Lien Note Claim shall receive, subject to the terms of th[e] Plan, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim its Pro Rata Share of:
>
> **(i)  If Class 5 votes to accept the Plan or is presumed to have accepted the Plan**: Cash in an aggregate amount equal to such holder's Pro Rata portion of the 1.5 Lien Cash Pool.
>
> **(ii)  If Class 5 votes to reject the Plan**: Replacement 1.5 Lien Notes with a present value equal to the Allowed amount of such holder's 1.5 Lien Note Claims Allowed pursuant to Section 5.5(a) hereof, any applicable make-whole claim, prepayment penalty, or Applicable Premium to the extent Allowed by the Bankruptcy Court.

Chapter 11 Plan, § 5.5(b).  Section 5.5(a) of the Plan provides that "[n]o Applicable Premium, prepayment penalty, 'make-whole' or similar claim shall be Allowed with respect to the 1.5 Lien Note Claims." Chapter 11 Plan, § 5.5(a).  In violation of the Intercreditor Agreement, neither of these treatments, supported by the RSA Parties, provides for the *payment in full in cash* of the 1.5 Lien Lenders' claims (which include the make-whole payment referenced above).

41.     Moreover, the RSA Parties' support of the cramdown of the holders of the 1.5 Lien Notes as contemplated by the Chapter 11 Plan violates numerous provisions of the

-17-

Intercreditor Agreement as set forth above.  Indeed, any support by the Second-Priority Secured Parties of any cramdown of the 1.5 Lien Lenders' claims would violate the Intercreditor Agreement.

42.     Second, under the RSA, if the Plan is confirmed, the Second-Priority Secured Parties, including the RSA Parties, will receive new shares in the Debtors and own 100% of the reorganized company, while enjoying the exclusive ability to participate in a rights offering prior to the Discharge of Senior Lender Claims.  These new shares reflect the full value of the company and are therefore the proceeds of Common Collateral.  They would be issued in exchange for the debt of the Second-Priority Secured Parties and the release of their liens. Wilmington alleges on information and belief that the Second-Priority Secured Parties do not intend to transfer that stock to the Senior Lenders or to WSFS to hold in trust for the Senior Lenders, as they are obligated to do under the Intercreditor Agreement.

43.     Third, under the RSA, the Debtors will pay professional fees of the RSA Parties.  The professional fees will be paid out of Common Collateral or the proceeds thereof. Because the Senior Lenders' claims, including those of the 1.5 Lien Lenders, have not been discharged (i.e., *paid in full in cash),* this is a violation of the Intercreditor Agreement.

44.     Fourth, under the RSA and a related agreement (the Backstop Commitment Agreement ("BCA"), dated as of May 9, 2014), the RSA Parties are entitled to terminate the RSA and receive a $30 million payment from MPM based on a number of easily triggered termination events largely in the control of the RSA Parties including, among other things, if the Debtors are unable to implement their strategy of *not* paying the Senior Lenders in full in cash.  (RSA § 2.1 & 2.2; BCA § 3.1).  If the RSA Parties elect to terminate the RSA, they

will receive Common Collateral or the proceeds of Common Collateral in the form of $30 million in cash.  (BCA § 3.1).

## FIRST CAUSE OF ACTION:  BREACH OF CONTRACT

### (Against the RSA Parties)

45.    Plaintiff repeats and realleges all foregoing allegations of the Complaint as if set forth fully herein.

46.    The Intercreditor Agreement is a contract to which both Plaintiff and the RSA Parties, through the Second Lien Trustee as their authorized agent, are parties.

47.    Plaintiff and the 1.5 Lien Lenders have performed all obligations required under the Intercreditor Agreement.

48.    The RSA Parties have breached their legal obligations under the Intercreditor Agreement.

49.    The 1.5 Lien Lenders, for whom Wilmington is the agent, have suffered damages and continue to suffer damages resulting from the breach in an amount to be determined at trial.

## SECOND CAUSE OF ACTION:  BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against the RSA Parties)

50.    Plaintiff repeats and realleges all foregoing allegations of the Complaint as if set forth fully herein.

51.    The Intercreditor Agreement is a contract to which both Plaintiff and the RSA Parties, through the Second Lien Trustee as their authorized agent, are parties.

52.    Plaintiff and the 1.5 Lien Lenders have performed all obligations required under the Intercreditor Agreement.

53.     The Intercreditor Agreement is governed by New York law.  (§ 8.10.)

54.     In every contract governed by New York law there is an implied covenant of good faith and fair dealing which precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement.

55.     By taking the actions set out above, the RSA Parties have injured the rights of the 1.5 Lien Lenders, whom Plaintiff represents, to receive the benefits of the Intercreditor Agreement, and have otherwise acted in bad faith in breaching duties that were consistent with the terms of the Intercreditor Agreement.

56.     The 1.5 Lien Lenders for whom Plaintiff is the agent suffered damages and continues to suffer damages resulting from the breach in an amount to be determined at trial.

## THIRD CAUSE OF ACTION:  DECLARATORY RELIEF

### (Against the RSA Parties)

57.     Plaintiff repeats and realleges all foregoing allegations of the Complaint as if set forth fully herein.

58.     No Discharge of Senior Lender Claims, including the claims of the 1.5 Lien Lenders, has occurred, and thus the RSA Parties are barred under the Intercreditor Agreement from receiving Common Collateral or the proceeds of Common Collateral.

59.     Pursuant to the RSA Agreement and the Debtors' Chapter 11 Plan, the RSA Parties will receive Common Collateral or the proceeds of Common Collateral in the form of reimbursement of certain fees.

60.     If the RSA Agreement is terminated, the RSA Parties may receive a termination fee of $30 million.

61.     If the RSA Parties receive any Common Collateral or the proceeds of Common Collateral, including in connection with the RSA Agreement, they will be in further violation of the Intercreditor Agreement.

62.     Based on the RSA Parties' stated intention to honor the RSA and their obligations contained therein, including their support of the approval of the disclosure statement describing the Plan, Plaintiff has received direct, definitive notice that the Defendants are threatening to repudiate their obligations under the Intercreditor Agreement.

63.     There is a bona fide, justiciable controversy between the parties that involves a present prejudice to Plaintiff.

## FOURTH CAUSE OF ACTION:  DECLARATORY RELIEF

### (Against the RSA Parties)

64.     Plaintiff repeats and realleges all foregoing allegations of the Complaint as if set forth fully herein.

65.     The Debtors' Plan provides alternative treatments for the 1.5 Lien Lenders' claims, neither of which provide for the payment in full in cash of said claims.  Receipt of anything other than payment in full in cash of all Obligations (as defined in footnote 4, *supra*) owed to the 1.5 Lien Lenders does not constitute a Discharge of Senior Lender Claims, and thus the conditions of the Intercreditor Agreement allowing for payment to Second-Priority Secured Parties remain unsatisfied under either Plan alternative.

66.     Although the Debtors' Plan has not been confirmed, based on the RSA Parties' stated intention to honor the RSA and their obligations contained therein, including their support of the Plan, Plaintiff has received direct, definitive notice that the RSA Parties are violating their obligations under the Intercreditor Agreement.

67.     There is a bona fide, justiciable controversy between the parties that involves a present prejudice to the Plaintiff.

## FIFTH CAUSE OF ACTION:  DECLARATORY RELIEF

### (Against All Defendants)

68.     Plaintiff repeats and realleges all foregoing allegations of the Complaint as if set forth fully herein.

69.     No Discharge of Senior Lender Claims, including the claims of the 1.5 Lien Lenders, has occurred nor will a Discharge of Senior Lender Claims occur if the Debtors' Pan is confirmed, as such Plan does not provide for the payment in full, in cash, of the Senior Lender Claims.

70.     If the Debtors' Plan is confirmed, the Debtors will either:  (a) deliver to the Intercreditor Agent (JPMCB); (b) deliver to the Second Lien Trustee (WSFS); or (c) deliver directly to the Second-Priority Secured Parties, a distribution under such Plan for the benefit of the Second-Priority Secured Parties.  If this occurs, the Second-Priority Secured Parties will have received the proceeds from the "collection on" the Common Collateral before the "Discharge of Senior Lender Claims" has occurred, which would violate the Intercreditor Agreement.  If either JPMCB or WSFS receives any distribution under the Debtors' Plan, they should be ordered to turn those proceeds over to Plaintiff or to hold those proceeds in trust for the benefit of Plaintiff, as agent for the 1.5 Lien Lenders.  Similarly, if the Second-Priority Secured Parties receive any distribution under the Debtors' Plan, they should be ordered to turn those proceeds over to Plaintiff or to hold those proceeds in trust for the benefit of Plaintiff, as agent for the 1.5 Lien Lenders.

71.     Although the Debtors' Plan has not been confirmed, based on the RSA Parties' stated intention to honor the RSA and their obligations contained therein, including their support of the Plan, Wilmington has received direct, definitive notice that the RSA Parties are threatening to repudiate their obligations under the Intercreditor Agreement.

72.     There is a bona fide, justiciable controversy between the parties that involves a present prejudice to the Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that a judgment and order be issued:

A.      For compensatory damages in an amount to be determined at trial.

B.      For a declaration that if the Second-Priority Secured Parties receive any Common Collateral or proceeds of Common Collateral, including in connection with the RSA Agreement, before the Discharge of Senior Lender Claims has occurred, that the Second-Priority Secured Parties are obligated to turn that Common Collateral and/or proceeds thereof, as the case may be, over to Wilmington, as agent for the 1.5 Lien Lenders, or to hold that Collateral in trust for the benefit of Wilmington, as agent for the 1.5 Lien Lenders.

C.      For a declaration that if JPMCB receives any Common Collateral or proceeds of Common Collateral, including without limitation stock of the reorganized debtor, before the Discharge of Senior Lender Claims has occurred, that JPMCB is obligated to turn that Common Collateral and/or proceeds thereof, as the case may be, over to Wilmington, as agent for the 1.5 Lien Lenders, or to hold it in trust for the benefit of Wilmington, as agent for the 1.5 Lien Lenders.

D.      For a declaration that if WSFS receives any Common Collateral or proceeds of Common Collateral, including without limitation stock of the reorganized debtor, before the Discharge of Senior Lender Claims has occurred, that WSFS is obligated to turn that Common Collateral and/or proceeds thereof, as the case may be, over to Wilmington, as agent for the 1.5 Lien Lenders, or to hold it in trust for the benefit of Wilmington, as agent for the 1.5 Lien Lenders.

E.      For a declaration that a Discharge of Senior Lender Claims (which includes 1.5 Lien Lenders' claims) requires payment in full in cash, and that the RSA Parties are in violation of the Intercreditor Agreement by supporting the  Debtors' Plan which does not so provide.

F.      For interest at the legal rate as appropriate.

G.      For the cost of suit as incurred herein.

H.      For reasonable attorneys' fees to the extent permitted by law; and

I.      For such other and further relief as the Court deems just and proper.

Dated: New York, New York
July 16, 2014

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By:

Steven J. Reisman
Theresa A. Foudy
Gabriel Hertzberg
101 Park Avenue
New York, New York  10178-0061
Tel:  (212) 696-6000
Fax:  (212) 697-1559
Email:  sreisman@curtis.com
          tfoudy@curtis.com
          ghertzberg@curtis.com

*Counsel for Wilmington Trust,*
*National Association, as Trustee*

19109506